## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

|  |  |  |
|---|---|---|
| **AMANDA DEANNE SMITH** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil No. 2:08CV281** |
| | : | |
| **OFFICER R. R. RAY** | : | |
| **And** | : | |
| **OFFICER JAY KEATLEY,** | : | |
| | : | |
| **Defendants.** | : | |

### OPINION AND ORDER

Plaintiff, Amanda Deanne Smith ("Smith"), filed this action to recover for injuries arising from her arrest at the home of a friend on September 21, 2006. She has alleged state law tort claims, and constitutional claims under 42 U.S.C. § 1983 against two officers involved in the arrest, Officer R. R. Ray ("Officer Ray") and Officer Jay Keatley (" Officer Keatley"). The matter is before the Court to resolve cross motions for summary judgment. On September 2, 2011, both parties filed a Consent to Jurisdiction by Magistrate Judge pursuant to 28 U.S. C §636(c) and Fed. R. Civ. P. 73. (ECF No. 140). By Order filed November 7, 2011, the case was referred to the undersigned for all further proceedings. (ECF No. 200). The parties' cross motions are fully briefed and the Court heard oral argument on December 6, 2011. For the reasons set forth in detail below, the Court DENIES Smith's motion for summary judgment, and GRANTS in part and DENIES in part Officer Ray's motion for summary judgment and GRANTS Officer Keatley's motion for summary judgment.

# I. **PROCEDURAL HISTORY**

An abbreviated review of the cases' long procedural history, which has included an appeal to the Fourth Circuit, is relevant and necessary to the summary judgment analysis. Plaintiff's original Complaint was filed in Virginia Beach Circuit Court, removed to this Court on June 18, 2008, and assigned case number 2:08cv281 (hereafter the "281-Complaint") . The 281-Complaint contained allegations against Officer Ray and another unknown City of Virginia Beach police officer, described in the style of the case as Unknown Officer, and in the body of the 281-Complaint as Second Officer. The claims relate to events that transpired when Smith was arrested by Officer Ray on September 21, 2006. (ECF No. 1-5). The 281-Complaint, which remains before the Court, asserts that Officer Ray used excessive force during Smith's arrest. (ECF No. 119). It also asserts that the Unknown Officer or Second Officer (now named as Officer Keatley) sexually assaulted her during a pat-down search. The 281-Complaint, as presently constituted, asserts claims against Officer Ray and Officer Keatley for assault, battery and constitutional claims under 42 U.S.C. § 1983. The Complaint also accuses Officer Ray of false imprisonment and malicious prosecution.

On September 22, 2008, Smith filed a separate action, which arose out of the same series of events. The second claim, which Smith filed directly in this Court, was assigned civil number 2:08cv449. The 449-Complaint contained all of the same factual allegations as the 281-Complaint. It described the alleged actions of Officer Ray and the Unknown Officer, but did not contain the substantive claims which had been alleged against the two in the 281-Complaint. Instead, Smith named Officer Ray as well as new defendants, including a civilian, several additional officers (including Officer Keatley) their supervisors, and the City of Virginia Beach as their employer. The 449-Complaint asserted new theories of bystander, supervisory, and

municipal liability under 42 U.S.C. § 1983, as well as state tort claims.

The two actions were consolidated on October 29, 2008, and eventually the Court entered an Order emphasizing that Smith's Second Amended 449-Complaint, which she filed after consolidation, would be the sole active complaint in the matter (ECF No. 52 at 2), effectively dismissing the 281-Complaint and its claims against Officer Ray and the Unknown Officer, which Smith had not included in the 449-Complaint either originally or after amendment.

The defendants filed a motion for summary judgment which was referred to a Magistrate Judge for a report and recommendation. Confirming the Magistrate Judge's recommendation, the Court granted judgment in favor of all the defendants on the federal claims set forth in the Second Amended 449-Complaint, including the claims of bystander liability against Officer Keatley and Officer Ray. The Court also declined jurisdiction of the state claims. (ECF No. 102). Smith appealed to the Fourth Circuit Court of Appeals. (ECF No. 103).

The Fourth Circuit, in an unpublished but detailed written opinion, concluded that this Court correctly dismissed Smith's claims of bystander, supervisory, and municipal liability in the Second Amended 449-Complaint and appropriately declined jurisdiction over the remaining state claims. Reviewing the evidence in the summary judgment record the Fourth Circuit identified three alleged constitutional claims underlying Smith's assertions of bystander and municipal liability. The Court first found no constitutional violation resulting from Smith's seizure as the evidence, even in the light most favorable to Smith, demonstrated that exigent circumstances and Officer Ray's reasonable suspicion that Smith was helping to harbor a missing minor child, justified Officer Ray's seizure. The opinion then noted, however, that a reasonable juror could have found constitutional violations in both Officer Ray's use of excessive force to effect the seizure and the Unknown Officer's alleged sexually invasive search. However, because none of

3

the named defendants had sufficient notice of these alleged violations to stop them, the Fourth Circuit affirmed summary judgment on all of the bystander claims.

The Fourth Circuit also concluded that the Court erred by not considering the claims Smith originally raised in the 281-Complaint. According to the Fourth Circuit, the consolidation for trial of the 281- and 449-Complaints did not effect a merger, and the Court should have considered the constitutional and tort claims alleged against Officer Ray and the Unknown Officer. (ECF No. 107 at 11). It therefore remanded the case with instructions to revive the original Complaint for further proceedings.

After remand, Smith moved to Amend the 281-Complaint to specifically identify Officer Keatley as the Unknown Officer. The Court granted Smith's motion over the Defendant's objection. (ECF No. 120). The Court noted that Officer Keatley had notice that Smith believed he was the Second Officer on the basis of Smith's written motion filed January 23, 2009, (ECF No. 69 at 7) and on a hearing held the same day (ECF No. 94 at 10). With discovery now concluded all parties have moved for summary judgment.

## II.   FACTUAL ALLEGATIONS

Because all parties have moved for summary judgment, the Court reviews the facts as alleged by each. The source of Smith's encounter with the police is not disputed. On the afternoon of September 21, 2006, Officer Ray, a uniformed police officer for the City of Virginia Beach, arrived at a home on Adler Avenue to assist Tony Bullard, ("Bullard) a private citizen, with finding T., Bullard's missing juvenile stepson. Bullard later testified that he was not married to T.'s mother and thus was not T.'s stepfather, however, this fact was not known to Officer Ray during the encounter. (Bullard Dep., ECF No. 164-3 at 1). Bullard believed that T. was staying at the Adler Avenue home, but was told by its residents that T. was now at another

4

house on Marlewood Way. (Bullard Dep., ECF No. 148-4 at 2).

Arriving at the second address, Officer Ray and Bullard looked through a window and saw several young men standing together inside the house. Bullard tentatively identified one of the young men as his stepson. Officer Ray knocked on the door of the residence, and heard "scurrying" sounds coming from inside. (Ray Dep., ECF No. 134-1 at 6). Smith opened the door and exited the house after being instructed to do so by Officer Ray.

Officer Ray asked Smith for her name and age, and whether she was the homeowner. Smith gave the officer her first name, her age, then twenty-two, and explained that she did not reside there. Officer Ray then asked Smith if T. was inside the house.

At this point the parties' descriptions diverge. Smith claims that she answered that T. was not there. Officer Ray claims Smith made no response. Officer Ray and the civilian, Bullard, both claim that, throughout the encounter, Smith appeared unfocused and intoxicated. (Ray Dep., ECF No. 134-1 at 23) (Bullard Dep., ECF No. 148-4, at 23). Smith denies being impaired or otherwise unresponsive. No drug or alcohol tests were ever performed on Smith. Officer Ray next asked for "Joel," an adult acquaintance of T. Smith claims she said that Joel was there, and told Officer Ray to "Hold on," turning towards the door to get Joel. Officer Ray alleges that Smith did not respond when asked about the whereabouts of T. or Joel. As Smith turned away and opened the screen door, Officer Ray reached across her and shut it. (Smith Dep., ECF No. 134-2 at 3). Officer Ray agrees that he prevented Smith from opening the door, but claims he did so by holding it closed rather than shutting the door. (Ray Dep., ECF No. 134-1 at 11). According to Smith, Officer Ray's sudden movement to prevent her from re-entering the home startled her, and she took a step away from the house off the small stoop where they had been standing. (Smith Dep., ECF No. 134-2 at 3).

Officer Ray – allegedly concerned that Smith was attempting to flee – grabbed her arm, and Smith pulled her arm away. (Smith Dep., ECF No. 134-2 at 3; Ray Dep., ECF No. 134-1 at 20-21). Officer Ray claims that Smith then began hitting and kicking him. (Ray Dep., ECF No. 134-1 at 29, 36, 39, 41, 51). Smith denies ever striking out at Officer Ray at any time during the encounter. (Smith Dep., ECF No. 134-2 at 43). She alleges that when she attempted to move away from the house Officer Ray, without saying anything, flung her to the ground. Id. at 3. Officer Ray states that he advised her he needed to question her further and only restrained Smith to continue his investigation. He states that he did not escalate the struggle except in response to Smith's hitting and kicking him. Officer Ray acknowledges that the two then struggled and eventually both fell to the ground with Officer Ray's body falling partially on Smith's back. (Ray Dep., ECF No. 134-1 at 30-31). Bullard recounts a third version of events stating that he, in an effort to further assist Officer Ray, grabbed Smith's legs, whereby Smith fell onto her stomach, and Officer Ray landed atop her back. (Bullard Dep., ECF No. 148-4 at 17; ECF No. 182-6 at 41).

All agree that a struggle ensued on the ground. Smith states she could not breathe and was trying to lift herself to get air. She states that Officer Ray had her pinned to the ground with his knee in her back. (Smith Dep., ECF No. 134-3 at 4). Officer Ray and Bullard both describe Smith refusing to produce her hands and continuing what they perceived as a struggle to injure Officer Ray and/or escape. Officer Ray then struck Smith three times on the right side of her body. (Ray Dep., ECF No. 134-1 at 42, 53). Officer Ray contends the blows were a distraction technique intended to assist in getting Smith under control. At some point Officer Keatley arrived on the scene, and assisted Officer Ray with handcuffing Smith. (Ray Dep., ECF No. 134-1 at 58). Officer Keatley was a K-9 officer and he was holding his German Sheppard canine

6

partner, "Diesel."

Officer Keatley states that he inquired whether Officer Ray needed the assistance of the dog and Officer Ray declined. Officer Keatley then states he held the dog at arm's length and assisted in handcuffing Smith with his free hand. (Keatley Dep., ECF No. 182-11 at 10). Smith describes the handcuffing differently. She states that one of her arms was forced behind her back to the point she could see her hand behind her shoulder. After she was handcuffed, Smith alleges that Officer Ray then brought her to her feet by grabbing her by her hair with enough force to tear hair from her scalp. (Smith Dep., ECF No. 134-2 at 8-9). Officer Ray denies twisting Smith's arm unnecessarily, and denies pulling her hair, stating that he raised Smith to her feet by holding her arms. (Ray Dep., 134-1 at 60).

At some point during the struggle a knife fell onto the ground from Smith's sweatshirt. Officer Ray did not notice the knife until Smith was standing and in handcuffs. (Ray Dep., ECF No. 134-1 at 60). Officer Ray refers to the knife as a switchblade which he states was partially open on the ground. He alleges that Smith never admitted to having it. (Ray Dep., ECF No. 134-1 at 65-67). The knife was apparently destroyed after state court proceedings were concluded. (Ray. Dep., ECF No. 134-1 at 74).

Officer Ray states that he brought Smith to his police car, searched her, and then placed her in the back seat. (Ray Dep., ECF No. 134-1 at 60). While searching Smith, Smith claims Officer Ray asked whether she had any weapons, and she admitted that she had a pocketknife. (Smith Dep., ECF No. 134-2 at 14). She states that Officer Ray left her next to his cruiser and walked back towards the house to retrieve the knife. (Smith Dep., ECF No. 134-2 at 14; Ray Dep., ECF No. 134-1 at 61). Smith described the knife as a small pocket knife, which she used to open packages.

7

Though Officer Ray denies that anyone else searched Smith, Smith alleges that while Officer Ray was retrieving the knife, she was searched by another officer she now claims was Officer Keatley. (Ray Dep., ECF No. 134-1 at 61-62; Smith Dep., ECF No. 134-2 at 58). In a telephone interview with police investigators Bullard also stated that another officer searched Smith, but he did not identify the officer or corroborate Smith's description of the sexually invasive nature of the search. (Bullard Dep., ECF No. 148-4 at 13).[1] During this search Smith claims that the officer involved inappropriately touched her breasts and slightly penetrated her genitalia, through her clothes, with his finger. (Smith Dep., ECF No. 134-2 at 59-60). Smith claims she screamed, cried out, and yelled during this encounter. (Smith Dep., ECF No. 134-2 at 62). Officer Keatley denies ever searching Smith at all, and by extension denies that he ever committed the sexually invasive pat down search which she initially attributed to the Unknown Officer. (Keatley Dep., ECF No. 182-11 at 30) (Keatley Aff., ECF No. 182-12 at 3-4).

Officer Ray then drove Smith to the police station. Officer Ray told Smith that she was under arrest for obstruction of justice and unlawfully carrying a concealed weapon (the knife). Smith was brought before a state magistrate and charged with obstruction of justice and carrying a concealed weapon. The parties agree these charges were resolved in a manner not unfavorable to Smith.

Smith claims she suffered both physical and psychological injuries as a result of the encounter. She received medical treatment for a broken rib and has identified experts prepared to opine as to both her physical and psychological injuries.

---

[1] At his deposition, Bullard could not recall a second officer searching Smith. In the telephone interview conducted after the incident by a Virginia Beach investigator, he initially stated that Ray searched her, then on reflection stated another officer searched her. Bullard's statement describes only one search which he first attributes to Officer Ray and then to another officer whom he does not identify. (Bullard Statement, ECF No. 158-2 at 9).

8

## III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the Court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the Court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); See Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

9

## IV.   CONCLUSIONS OF LAW

**A.   42 U.S.C. §1983 claims against Ray**

Smith alleges that her constitutional rights were violated by her seizure without a warrant, the excessive force used to effect the seizure, and the subsequent search she describes as a sexual assault. In its prior opinion, the Fourth Circuit concluded on the record before it that Smith's evidence established no constitutional claim related to her seizure. The Court did note, however, that a reasonable jury could find Ray used excessive force in effecting the arrest, and that the subsequent search by the Unknown Officer, now named as Officer Keatley, could, if true, violate Smith's constitutional rights. Although the summary judgment record here is substantially similar to that reviewed by the Fourth Circuit, the parties have submitted additional evidence and deposition transcripts. In addition, because the direct claims against Officer Ray and Officer Keatley were not before it, the Fourth Circuit never considered the question of qualified immunity.

"It is clearly established that citizens have a Fourth Amendment right to be free from unreasonable seizures accomplished by excessive force." Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009) (citing Waterman v. Batton, 393 F. 3d 471, 476 (4th Cir. 2005). It is likewise well-established that a warrantless seizure inside a home is "presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586-90 (1980). This Fourth Amendment protection also applies to the curtilage of a home, including the front doorway, such that "probable cause, and not reasonable suspicion, is the appropriate standard for [seizures within] the curtilage." Rodgers v. Pendleton, 249 F.3d 279, 287 (4th Cir. 2001). There are, however, exceptions to the warrant requirement, including stops or limited seizures justified by exigent circumstances. United States v. Taylor, 624 F.3d, 626, 631-32 (4th Cir. 2010); Hunsberger v.

10

Wood, 570 F.3d 546, 555-57 (4th Cir. 2009).

When probable cause or exigent circumstances justify a seizure, the Fourth Amendment stills prohibits the use of excessive force to achieve one. Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).  In evaluating excessive force claims the Court must determine "whether the force employed was objectively reasonable under all the circumstances, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest, or attempting to evade arrest by flight.'" Lewis v. Boucher, No. 01-1584 (unpublished) 35 Fed. Appx. 64, 69 (4th Cir. 2002) (citing Graham v. Conner, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989)).  The reasonableness test is not "capable of precise definition." Jones, 325 F.3d at 527.  It requires "careful attention to the facts and circumstances of each particular case."  The Supreme Court has held that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S.Ct. 1865.

When facts suggest a level of force may be excessive, the doctrine of qualified immunity still shields police officers from liability for constitutional claims if "a reasonable officer possessing the same information could have believed that his conduct was lawful." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991). The defense of qualified immunity protects officers from liability in cases "where clearly established law does not show that [their actions] violated the Fourth Amendment." Pearson v. Callahan, 555 U.S. 223, 243-44, 129 S.Ct. 808, 822 (2009). This pure question of law turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Wilson v. Layne, 526 U.S. 603, 614, 119 S.Ct. 1692 (1999).  The doctrine exists "to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." Hope v. Pelzer, 536 U.S.

11

730, 739, 122 S.Ct. 2508 (2002). The Fourth Circuit has held that qualified immunity is to be applied with due respect for the perspective of police officers on the scene and not with the greater leisure and acquired wisdom of judicial hindsight. Gooden v. Howard County, 954 F.2d 960, 964-65 (4th Cir. 1992) (en banc). However, when "a determination of what actually happened is absolutely necessary to decide whether [an officer] could reasonably have believed his actions were lawful," summary judgment on the grounds of qualified immunity should be denied. Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir. 1992).

In this case, material facts in dispute preclude granting either motion for summary judgment on the constitutional claims of excessive force against Officer Ray. First, evaluating those claims in the light most favorable to Officer Ray, reasonable jurors could conclude there were no constitutional violations resulting from his arrest of Smith.[2] As Officer Ray described the encounter, while performing his duties as a sworn law enforcement official in the City of Virginia Beach, he encountered Smith at a residence which he believed harbored a missing juvenile. In attempting reasonably to inquire, he encountered an intoxicated or impaired subject who was at first nonresponsive and then combative and violent. He stated that he clearly advised Smith she was under investigative detention, repeatedly asked her to cooperate and she violently resisted. Although Officer Ray admits an intense physical struggle ensued, including his use of three distraction blows to Smith's midsection, he flatly denies twisting Smith's arm unnecessarily, or pulling Smith to her feet by her ponytail. Accordingly, while physically vigorous, viewing the evidence of the struggle in the light most favorable to Officer Ray, he

---

[2] In her briefing Smith has attempted to rely on purported admissions by both Officers to support her summary judgment motion. She claims the two failed to respond to Requests for Admission and, as a result, are deemed to have admitted each Request. Fed. R. Civ. P. 36(a)(3). Both Defendants claim to have timely answered the admissions, and at a prior hearing the Court advised Smith's counsel to file an appropriate motion if he intended to rely on the Admissions. Counsel filed no motion and the Court does not rely on any of the disputed discovery.

describes a measured response to what he reasonably perceived as the escalating and unpredictable threat posed by Smith's resistance. Reasonable jurors could conclude that the force used was reasonable. As a result, the Court denies Smith's motion for summary judgment on her constitutional claims against Officer Ray.

Viewing these facts in the light most favorable to Smith, however, presents a different question. First, with regard to Smith's claims related to her seizure, no new evidence in the summary judgment record alters the Fourth Circuit's previous observation that Officer Ray had reasonable grounds to seize Smith based on his belief that she may have been contributing to the delinquency of a minor. Although Smith claims additional evidence should prevent summary judgment on this point, the Court disagrees. (See infra, part IV(C)). Accordingly, the Court will grant Officer Ray's motion for summary judgment as to Smith's claims of an unconstitutional seizure.

Smith's excessive force claims, however, will depend upon a resolution of disputed facts. Viewed in the light most favorable to Smith, Officer Ray's search for the missing juvenile was met with an appropriate verbal response, when Smith asked him to "hold on" while she returned to the residence to locate Joel. Smith testified that Officer Ray's startling decision to slam the door, unaccompanied by any verbal instructions, caused Smith to recoil, after which she claims Officer Ray grabbed her arm and threw her to the ground without warning, placed the full weight of his body on her back with his knee in her back, struck her three times breaking a rib, and painfully twisted her arm behind her back. Finally, after she was secured in handcuffs, Smith claims Officer Ray raised her to a standing position by her hair. She suffered objective injuries, including visible bruising and a broken rib, and also complains of continuing shoulder pain and limited range of motion due to the alleged arm twisting.

13

In his summary judgment motion Officer Ray argues that even this conduct (though disputed) should be deemed reasonable based on the way he perceived Smith's behavior. He contends the Court should accept his description of Smith's ongoing resistance as it is based on Officer Ray's perceptions of Smith's conduct and thus not in conflict with her markedly contrary description of her motives.

This argument is persuasive only to a point. It is true, for example, that some portion of Smith's struggle – whether motivated – as she says – by a desire to breathe, or as Officer Ray describes it, by her generally violent and obstructive reaction to the stop – would be fairly perceived as resistance by Officer Ray or any reasonable officer. However, throughout the encounter Smith claims she was never told she was subject to an investigative detention or under arrest. (Smith Dep. ECF No. 134-2 at 4) ("He didn't say anything. I know for a fact he didn't say anything."). While Smith admits struggling to free her arms and to get away from Officer Ray's physical restraint, taking the evidence in the light most favorable to Smith, her struggle was in response to, rather than the cause of, the escalating physicality of the stop. It is undisputed that prior to the encounter Smith was not suspected of any criminal wrongdoing. There was no warrant for her arrest, and she was on the porch of a private residence with the permission of its owner when the encounter began. Accepting her version of events as true, she was not intoxicated, or belligerent. Although she was later found to be carrying a folding knife, it is undisputed that Officer Ray did not know this until after Smith was secured. Moreover, while she remained within the residence, carrying the knife was not unlawful. Finally, Smith claims that after she was secured in handcuffs Officer Ray grabbed her ponytail and raised her to her feet using it. As the Fourth Circuit has already observed on a nearly identical record in this case, taking this evidence in the light most favorable to Smith, a reasonable juror could find that

14

Officer Ray used excessive force in detaining her.

Officer Ray argues that notwithstanding the foregoing record, and the Fourth Circuit's observation, he is still entitled to summary judgment on the basis of qualified immunity because the conduct described was not clearly established as unlawful in September, 2006 when the altercation occurred. Indeed on brief, counsel cites several cases in which intense physical struggles were nonetheless justified, and not a clearly established violation of the suspect's Fourth Amendment rights. Karadi v. Jenkins, 7 Fed. Appx. 185 (4th Cir. 2001) (arm behind the back); Dunn v. VanMeter, No. 5:09cv85 (unpublished), 2010 WL 3154972 (W.D. Va. April 9, 2010) (striking suspect in the side); Sullivan City of Pembroke Pines, 161 Fed. Appx. 906 (11th Cir. 2006) (knee in the back); Lee v. Heffner, 136 Fed. Appx. 807 (6th Cir. 2005) (knee in the back). Officer Ray contends that because Smith has produced no authority to suggest that the specific attributes of the altercation she described were known to be unlawful, Officer Ray is entitled to the protection of qualified immunity. This argument misconstrues the second prong of the qualified immunity inquiry.

If reasonable jurors could find a constitutional violation from the facts supported in the summary judgment record, entitlement to qualified immunity depends upon whether a reasonable officer, faced with similar facts, would have known his conduct was unlawful. Mellon v. Bunting, 327 F.3d 355, 365 (4th Cir. 2003). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 107 S.Ct. 3034 (1987). It requires an objective inquiry into the "legal reasonableness of an official's act." Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727 (1982). On summary judgment, however, this objective inquiry is based upon the facts

viewed in the light most favorable to the non-moving party, and when the resolution of those facts is essential to determining the objective legal reasonableness of the officer's actions, summary judgment should be denied. Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994).

Of the several cases Officer Ray cites involving similar levels of force in which officers received qualified immunity, none squarely resolves the issue before this Court. For example, in Dunn v. VanMeter, an unpublished opinion from the Western District of Virginia, the Court granted qualified immunity to an accused officer after a physical altercation with marked similarities to Smith's. As in this case, the officer allegedly struck an unarmed civilian and pushed his head into a screen door when the suspect turned away from him and walked towards his house. Dunn, 2010 WL 3154972 at *4. In Dunn, however, the officer was there to arrest the suspect on charges of assault and battery. By contrast, Smith was not suspected of any crime before the incident, much less any violent crime. More importantly, the Court in Dunn considered important facts not in dispute, including the fact that Dunn had been told by the officer that he was under arrest, and that during the struggle he was repeatedly told to produce his arms for handcuffing. In this case, taking the facts in the light most favorable to Smith, she denies being advised of any investigative detention and claims Officer Ray's physical restraint was unaccompanied by any verbal explanation.

Similarly, in Karadi v. Jenkins, the Fourth Circuit reversed the trial court's denial of qualified immunity to an officer who "grabbed" the arm of a shoplifting suspect and "forcefully" moved her to a security office. 7 Fed. Appx. At 194-95. The struggle in Karadi was far less intense than both parties here describe. The suspect was "forcefully" moved by placing her arm behind her back and eventually handcuffed, but there is no allegation that the suspect was injured. More importantly, as in Dunn, the force was authorized in part because the suspect was

admittedly confrontational, belligerent and refused to follow the officer's clear instructions to follow him. Id., at 195.

While Officer Ray also claims his takedown, distraction blows, and arm-twisting would be justified by Smith's refusal to follow his instructions, the timing and nature of those instructions is sharply contested. The question on summary judgment is whether – after resolving those factual contests in favor of Smith – a reasonable officer in Officer Ray's position would have known the force used was excessive. Several cases establish that, by 2006, a reasonable officer acting under these circumstances would have known his conduct was prohibited. In Rowland v. Perry, for example, decided in 1994, the Fourth Circuit considered arguments similar to those raised by Officer Ray. Rowland v. Perry, 41 F.3d at 173-74. Rowland involved claims of excessive force arising out of "a scuffle between a police officer and a citizen over a lost five dollar bill." Id. at 171. The officer, Perry, had witnessed what he thought was Rowland's theft of the bill from another patron waiting at a bus station. When Perry confronted Rowland about the bill, he resisted. As portrayed by the officer:

> Rowland shoved him in an attempt to escape, whereupon the officer grabbed Rowland by the collar. The use of force escalated as Rowland's level of resistance increased. Both combatants fell to the ground, whereupon Officer Perry finally subdued the suspect.

In the light most favorable to Rowland, however, the struggle was described in terms remarkably similar to Smith's.

> [Rowland] contends that without any provocation Officer Perry grabbed his collar and jerked him around, yelling harshly as he did so. Frightened, Rowland instinctively tried to free himself. In response, Officer Perry punched him and threw him to the ground . . . then used a wrestling maneuver throwing his weight against

17

Rowland's right leg and wrenching the knee until it cracked.

Id. at 172.

Like Officer Ray, Perry urged the Court to focus on Rowland's resistance to the struggle, which he argued justified the use of force. The Fourth Circuit rejected this view, instead writing that "[t]he better way to assess the objective reasonableness of force is to view it in full context with an eye toward the proportionality of the force in light of all the circumstances." Id. at 173. The Court noted that "the offense was a minor one," and that there was scant evidence Rowland was "a threat to the larger trained police officer." Finally, although Rowland resisted, the Court noted disputes of fact concerning his motive for resistance which – combined with the other Graham factors – precluded summary judgment on qualified immunity grounds. Id. at 174.

Rowland is not an isolated case. The Fourth Circuit and District Courts within it have on several occasions denied qualified immunity on excessive force grounds when the force used was disproportionate given the severity of the criminal conduct alleged and the threat posed by the suspect or detainee. Jones v. Buchanan, 325 F.3d 520, 533-34 (4th Cir. 2003) (detainee suspected of public intoxication receives broken nose); Kane v. Hargis, 987 F.2d 1005 (4th Cir. 1993) (detainee suspected of erratic driving receives cracked teeth). While these Fourth Circuit cases may involve physical injuries more serious than those alleged by Smith, the severity of the injury does not alone determine the proportionality of force used. Cowles v. Peterson, 344 F. Supp. 2d 472, 483-84 (E.D. Va. 2004) (qualified immunity denied when traffic suspect thrown to ground and arm-twisted complains of shoulder injury); Veney v. Ojeda, 321 F. Supp. 2d 733, 743-44 (E.D. Va. 2004) (no qualified immunity when passenger during traffic stop was thrown to the ground by the officer resulting in hand swelling from injury).

18

Considering the facts in the light most favorable to Smith, reasonable jurors could conclude that Officer Ray used excessive force. Viewed "in full context with an eye toward the proportionality of the force used in light of all the circumstances," a reasonable officer facing a similar situation would have known the force used was excessive. As a result, Officer Ray's motion for summary judgment and Smith's claims of excessive force is denied.

## B.    Assault and Battery by Officer Ray

In Virginia, battery is "an unwanted touching which is neither consented to, excused, nor justified." Koffman v. Garnett, 265 Va. 12, 574 S.E.2d 258, 261 (2003) (citing Washburn v. Klara, 263 Va. 586, 561 S.E.2d 682 (2002). Assault, meanwhile, consists of "an act intended to cause harmful or offensive contact with another person or apprehension of such contact . . . that creates in that other person's mind a reasonable apprehension of an imminent battery." Koffman, 574 S.E.2d at 261 (citing RESTATEMENT (SECOND) OF TORTS § 21 (1965)).

A police officer's use of reasonable force in the course of making a lawful arrest is justification sufficient to avoid liability for assault and battery. Broaddus v. Standard Drug Co., 179 S.E.2d 497, 503 (Va. 1971). Because material facts in dispute preclude a finding on summary judgment whether or not Officer Ray's use of force was reasonable, those same disputes prevent resolution of Smith's state law claims for assault and battery. Accordingly, the Court denies both Officer Ray and Smith's motions for summary judgment on the assault and battery claims. See Rowland, 41 F.3d at 174 (noting that parallel state claims of assault and battery are "subsumed within the federal excessive force claim," and will also proceed).

## C.    False Imprisonment by Officer Ray

To establish a claim for false imprisonment, Smith must show that her liberty was restrained without lawful process. Montgomery Ward & Co. v. Wickline, 188 Va. 485, 50

S.E.2d 387, 389 (1948). Smith's allegations do not present any denial of lawful process after the initial seizure. As a result, her claim of false imprisonment depends upon her assertion that her seizure was unlawful.

Warrantless searches and seizures inside a home are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586–90 (1980). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City v. Stuart, 547 U.S. 398, 403, (2006) (citations omitted). An officer may enter the home without a warrant if "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394, (1978) (citing McDonald v. United States, 335 U.S. 451, 456, (1948); Johnson v. United States, 333 U.S. 10, 14–15 (1948)); See also Hunsberger v. Wood, 570 F.3d 546 (4th Cir. 2009). An overnight guest is entitled to the nearly same rights and protections as the resident of the house. Minnesota v. Olson, 495 U.S. 91, 98–100, (1990).[3]

The Court agrees with Officer Ray that Smith's claim of false imprisonment presents no genuine dispute of material fact. Although the Court must view the information in the light most favorable to Smith, the Court must also look at the circumstances from the perspective of a reasonable officer in Officer Ray's position. See Mincey, 437 U.S. at 392 ("...the Fourth

---

[3] Smith testified that she was not a resident where the incident occurred and seeks an inference that she was an overnight guest. As the Fourth Circuit observed, it is unnecessary to address Smith's level of protection as a guest because even if she was entitled to full Fourth Amendment protections, the exigency of the circumstances justified Ray's seizure for further questioning. See Smith v. Ray, 09-1518, 409 Fed. Appx. 641, 647 (Va. 2011) (citing United States v. Taylor, 624 F.3d 626, 631–32 (4th Cir.2010); Hunsberger v. Wood, 570 F.3d 546, 555–57 (4th Cir.2009); Rogers v. Pendleton, 249 F.3d 279, 287 (4th Cir. 2001)). Smith's newly developed evidence, specifically, Bullard's testimony that he was not T.'s stepfather or father, does not alter Ray's perception of the situation at the time of her seizure for further questioning.

Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."). Officer Ray, accompanied by Bullard, arrived at the residence seeking to locate T., a minor runaway. Smith answered the door, and in response to a question about Joel, told the officer to "Hold on." As she turned back towards the residence, Officer Ray prevented her from entering. The fact that T. turned out not to be Bullard's stepson; that he was not actually in the residence; the fact that Smith may or may not have been intoxicated; and the debate as to whether Officer Ray held the door or slammed it shut, are all immaterial to Smith's false imprisonment claim as a matter of law.

After reviewing a nearly identical record, the Fourth Circuit held in this case that "a reasonable officer still would have had a basis for suspecting that Smith was contributing to the 'delinquency of a minor.'[4] Bullard had identified T. as one of the young men in the window of the house. A reasonable officer therefore would have had some cause for suspecting that a missing child was being harbored within the house. It does not matter that Bullard later turned out to have been mistaken." Smith v. Ray, 09-1518, 409 Fed. Appx. 641, 648 (Va. 2011) (footnote omitted).

In her motion for summary judgment, Smith alleges that she has since developed the record, adding additional evidence that shows no exigent circumstances existed to justify her arrest. She offers several statements from Bullard's deposition. Specifically, that: T. was not officially reported as a runaway; Bullard was not T's father or stepfather; Bullard did not specifically identify T. through the window of the house on Marlewood Way, and that T. was

---

[4] The crime of contributing to the delinquency of a minor is defined under Code of Virginia §18.2-371 as follows:
  Any person 18 years of age or older...who...willfully or contributes to, encourages, or causes any act, omission, or condition which renders a child delinquent... as defined in [Code of Virginia] §16.1-228...shall be guilty of a class 1 misdemeanor.

21

actually with his mother at the time. (P.'s Mem. In Opp., ECF No. 148 at 25-26). Facts revealed in hindsight, however, would not alter Officer Ray's state of mind or the impression he had <u>at the time</u> he decided to seize Smith. The Fourth Circuit acknowledged that T. was later found not to have been present at the Marlewood house, but that this later-revealed mistake did not bear on the reasonableness of Officer Ray's seizure at that moment. Smith also asserts that Ray could have "at any relevant time herein, secured the telephone number from Bullard of [T.'s] mother and called her to check whether [T.] was home." However, the existence of this type of alternative course of action does not render the seizure unreasonable. In <u>Hunsberger v. Wood</u>, the Fourth Circuit rejected a similar claim. "Whether in retrospect [another] course of action might have been preferable is not dispositive: '[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the seizure unreasonable.'" 570 F.3d 546, 556 (4th Cir. 2009) (quoting <u>Cady v. Dombrowski</u>, 413 U.S. 433, 441 (1973)).

The only relevant new claim is Smith's contention that Bullard had not identified his stepson within the residence at the time of the Marlewood altercation. This claim, however, is not supported by the record. Bullard testified that on approaching the Marlewood residence he looked in the window to see if he saw T., and saw "one that kind of from the side resembled him a little bit." Later in his deposition, Bullard stated, "I recall seeing someone that looked like him. So I'm sure that I would have said to, you know, Officer Ray, I said, you know that looks like that may be him. It could be him." (Bullard Dep., ECF No. 182-6 at 26). Officer Ray likewise testified that Bullard "pointed and said I believe that's my son there." (Ray Dep., ECF No. 134-1 at 5). Although Smith's counsel pointed out to Bullard that he made no mention of identifying the boy at Marlewood when he gave his earlier telephone interview, Bullard's testimony was not

22

inconsistent.

Based on the information he had at the time, and viewing the evidence in the light most favorable to Smith, Officer Ray had just cause to seize her. The Fourth Circuit held that the evidence in the summary judgment record "could have led a reasonable officer to believe that Smith sought to unlawfully conceal T. from his concerned stepfather." Smith v. Ray, 409 Fed. Appx. at 648. Smith has offered no new information that would change the way in which Officer Ray would have perceived the situation at the time. Based on the facts Officer Ray had at that moment, as the Fourth Circuit held, "[v]iewed objectively, these facts presented the exigent circumstances necessary to justify the warrantless stop of Smith." Id. Therefore, Officer Ray's Motion for Summary Judgment is GRANTED with respect to the claim for false imprisonment.

### D.      Malicious Prosecution by Officer Ray

To prevail in a malicious prosecution action in Virginia, Smith must prove by a preponderance of the evidence that "... the prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff." Reilly v. Shephard, 643 S.E.2d 216, 218 (Va. 2007) (citing Baker v. Elmendorf, 628 S.E.2d 358, 359 (Va. 2006)). "Actions for malicious prosecution arising from criminal, rather than civil, proceedings have been sustained in Virginia but are not favored. The requirements for maintaining an action for malicious prosecution arising from a criminal case are more stringent than those applied to other tort actions." Ayyildiz v Kidd, 266 S.E.2d 108, 110 (Va. 1980). "The stringent requirements imposed upon the action for malicious prosecution arising from a criminal case are designed to encourage persons to bring criminal actions in appropriate cases without fear of reprisal by civil actions, criminal

prosecutions being essential to the maintenance of an orderly society." Id. (citing Lee v. Southland Corp., 244 S.E.2d 756, 758 (Va. 1978)).

Probable cause is defined as "knowledge of such a state of facts and circumstances as excite the belief in a reasonable mind, acting on such facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." Commissary Concepts Management Corp. v. Mziguir, 594 S.E.2d 915, 917 (Va. 2004) (quoting Bill Edwards Oldsmobile v. Carey, 244 S.E.2d 767, 772 (Va. 1998)). "Whether probable cause existed is determined as of the time when the complained of action was taken." Id. The presence or absence of probable cause does not depend on the guilt or innocence of the accused, or on whether a crime was actually committed. See Burrell v. Virginia, 395 F.3d 508, 514 (4th Cir. 2005).

In this case, Smith argues that Officer Ray maliciously prosecuted Smith when he drove her to a Virginia Beach magistrate and obtained a warrant charging her with obstruction of justice and carrying a concealed weapon. (P.'s Mot. Summ. J., ECF No. 164 at 51; Def. Mem. in Opp., ECF No. 148 at 29). Smith notes, and Officer Ray admits, that both charges were resolved with a disposition not unfavorable to Smith. Id.; (Compl., ECF No. 119 at 16; Def. Answer, ECF No. 124 at 7). In order to prevail, however, Smith must also be able to show that Officer Ray acted without probable cause and with malice. Officer Ray argues that even accepting the facts in the light most favorable to Smith there are no material facts in dispute regarding his probable cause to charge her with both offenses.

With respect to the obstruction of justice charge, Virginia Code §18.2-460(A) states that "[i]f any person without just cause knowingly obstructs a ... law-enforcement officer ... in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so by such ... law-enforcement officer," he is guilty of obstruction of

justice. The Court of Appeals of Virginia held in <u>Ruckman v. Commonwealth</u>, that obstruction of justice "does not occur when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult but does not impede or prevent the officer from performing that task. For example, an accused's hiding or seeking 'to escape [an] officer by merely running away [is] not such an obstruction as the law contemplates.'" 28 Va.App. 428, 429-230, 505 S.E.2d 388, 389 (1998)(citing <u>Jones v. Commonwealth</u>, 141 Va. 471, 478-79, 126 S.E. 74, 77 (1925)).

However, even a minor act of resistance can be considered obstruction of justice, as there exists "...a broad distinction between avoidance and resistance or obstruction." <u>Brown v. Commonwealth</u>, Record No. 0770-09-2, 2010 WL 152047 (2010). In <u>Brown v. Commonwealth</u>, the accused pulled his arm away from an officer and then fled after being advised of his arrest. <u>Id.</u> The Court of Appeals of Virginia held that "[t]he act of pulling his arm from [the officer] constituted active resistance against a police officer so as to constitute obstruction of justice." <u>Id.</u> (footnote omitted). <u>See also</u>, <u>Burrell</u>, 395 F.3d at 515-16 (defendant's refusal to provide insurance information to investigating officer provided probable cause for obstruction charge notwithstanding defendant's later acquittal).

For purposes of Officer Ray's summary judgment motion, the Court accepts Smith's version of the facts -- that she did not strike or kick Officer Ray during their struggle. However, Smith admits that she turned away from him and pulled her arm away as Officer Ray held it to further his investigation. (Smith Dep., ECF No. 134-2 at 8).     Consistent with <u>Brown v. Commonwealth</u>, the act of pulling her arm away is sufficient to "excite the belief in a reasonable mind" that Smith was guilty of obstruction of justice. In fact, in her deposition Smith notes that she was informed in the police vehicle that "the obstruction of justice [charge] was for me

25

pulling my arm away." (ECF No. 134-2 at 35).   Therefore, based the undisputed facts, and

viewing all other evidence in the light most favorable to Smith, Officer Ray had probable cause

to charge Smith with obstructing justice, and the Court GRANTS Ray's motion for summary

judgment on this count.

Smith was also charged with carrying a concealed weapon.   Virginia Code §18.2-308

states:

> If any person carries about his person, hidden from common observation...any
> dirk, bowie knife, switchblade knife, ballistic knife, machete, razor, slingshot,
> spring stick, metal knucks, or blackjack...any weapon of like kind as those
> enumerated in this subsection, he shall be guilty of a Class 1 misdemeanor.....
> This section shall not apply to any person while in his own place of abode or the
> curtilage thereof.

Smith claims the knife, which fell from her clothes during the struggle, was a simple

folding pocketknife and, thus, could not have supported probable cause to charge her under this

statute.   Wood v. Henry County Public Schools, 495 S.E.2d 255 (Va. 1998) (holding that a

folding pocketknife is not within the statute's prohibition).   Since Wood was decided, however,

Virginia's appellate courts have struggled to define which knives are prohibited and which are

permitted to be concealed.   McMillan v. Commonwealth, 686 S.E.2d 525 (Va. App. 2009).   In

McMillan, a divided en banc Court of Appeals reversed the defendant's conviction under the

statute for carrying a type of folding knife – conduct which had been expressly held unlawful by

the trial court and the Court of Appeals in prior cases.   The en banc review in McMillan

produced a 7 – 4 majority opinion, and four other opinions, including three separate dissents.

In a concurring opinion Judge Petty summarized his view of the difficulty faced by law

enforcement officers attempting to decide which bladed instruments should be considered "a

weapon of like kind" under the statute:

26

> In [Wood] the Court concluded that a pocketknife was neither a dirk, bowie knife . . . or a weapon of like kind. Since that date our Supreme Court and this Court have considered the applicability of Code § 18.2-308(A) to various types of knives no fewer than ten separate occasions and the only consistency in the conclusions reached has been inconsistency.

McMillan, 686 S.E.2d at 530.

As relevant here, prior to the 2009 decision in McMillan, the Court of Appeals had twice affirmed convictions under the statute of defendants who were carrying folding knives. Kingrey v. Commonwealth, No. 2202-97-2, 1999 WL 1129723 (unpublished) (Va. Ct. App., July 13, 1999); Ohin v. Commonwealth, 622 S.E.2d 784 (Va. App. 2005). In Kingrey, for example, the defendant was convicted of carrying a butterfly knife, which was described as approximately "3 to 4 inches in length." Kingrey, 1999 WL 1129723 at *1. In addition, a 2005 Court of Appeals decision permitted inquiry into the "circumstances and purpose surrounding its possession and use" in determining whether "any given bladed instrument" was a weapon or common implement. Delcid v. Commonwealth, 526 S.E. 2d 273, 275 (Va. App. 2005). The rationale of Delcid may have been called into doubt in Thompson v. Commonwealth when the Supreme Court of Virginia overruled Kingrey and held that a folding butterfly knife would not sustain a conviction under the statute. Thompson v. Commonwealth, 673 S.E.2d 469 (Va. 2009). However, the state of the law in 2006 when Officer Ray made his probable cause assessment was that concealment of multiple types of folding knives could sustain a conviction, and the "circumstances surrounding its possession and use" were also relevant.

Viewed in light of this authority, it is undisputed that during the struggle between Smith and Officer Ray a knife, which Smith had concealed, fell from the pocket of her clothing. Smith testified that she "assumed" the knife would have been closed because she did not open it.

27

(Smith. Dep., ECF No. 134-2 at 31). She also stated that when Ray recovered the knife and showed it to her, it was closed. Id. Officer Ray, however, is the person who actually found the knife, and he testified that it was partially opened. (Ray Dep., ECF No. 134-1 at 60).

Officer Ray contends that it was a switchblade knife, but considering the facts in the light most favorable to Smith, the Court accepts Smith's assertion that it was a folding knife. The circumstances of its recovery, however, are undisputed. A knife fell from Smith's clothing while she and Officer Ray were engaged in a physical altercation, and that knife was found partially open.[5] These facts were sufficient to excite in the mind of a reasonable person the belief that Smith was carrying a concealed weapon. The fact that the charges against Smith were later resolved in her favor does not affect the reasonableness of Officer Ray's belief at the time she was charged. See Rykers v. Alford, 832 F.2d 895, 898-99 (affirming grant of qualified immunity to officer who incorrectly arrested father on child kidnapping charges, due to "ambiguities in Louisiana kidnapping laws and gaps in the available facts").

Finally, Smith alleges that Officer Ray acted with malicious intent by "fabricating a story" to the magistrate when he obtained a warrant for Smith's arrest. (Compl., ECF No. 119 at 19-20). There is simply no evidence in the record to support this accusation. The knife has allegedly been destroyed, and there is no record of Officer Ray's oral testimony to the magistrate. Because the Court finds that Officer Ray had probable cause to believe that Smith possessed a concealed weapon, based on the facts in the light most favorable to Smith, the Court will not presume that Officer Ray gave false testimony to the magistrate to obtain the warrant.

---

[5] Smith also argues that she was an overnight guest in the curtilage of the home, and therefore was entitled to carry a concealed knife. It is undisputed, however, that Smith stepped off the stoop of the house, and the altercation occurred in the yard in front of the house. (Smith Dep., ECF No. 134-2 at 4). Therefore, the knife was not recovered in the curtilage of the home.

28

Accordingly, the Court GRANTS Officer Ray's motion for summary judgment on malicious prosecution with regard to both the obstruction of justice and the concealed weapon charges.

### E.    42 U.S.C. § 1983 claims against Officer Keatley

The parties' cross-motions for summary judgment as to Officer Keatley's alleged sexual assault turn on the degree of evidence necessary to create a dispute of material fact as to the identity of the officer allegedly involved in the accused search. The Court can quickly dispose of Smith's motion for summary judgment. Officer Keatley has testified under oath that he did not search Smith. He stated that the only physical contact he had with her occurred when he assisted Officer Ray in placing her in handcuffs. This contact involved Officer Keatley holding Smith's wrist while Officer Ray placed her in handcuffs. Officer Keatley denied ever touching Smith in any other way. (Keatlely Dep., ECF No. 182-11 at 19). As a result, accepting the facts in the light most favorable to him as the non-moving party, reasonable jurors could conclude that he did not violate Smith's constitutional rights, or commit an assault and battery. Smith's motion for summary judgment will be denied.

Officer Keatley's motion for summary judgment against Smith requires that the Court view the facts and reasonable inferences from those facts in the light most favorable to Smith. Officer Keatley's argument, however, is not predicated on a finding that Smith's description of the alleged sexual assault did not amount to a violation of her constitutional rights, nor does

Officer Keatley specifically rely upon the defense of qualified immunity.[6]  Instead, relying on his

sworn testimony, Officer Keatley contends that – even if Smith was assaulted as she alleged – no

reasonable juror could conclude that he was the officer who committed the assault Smith

describes.

The movant "bears the initial burden of pointing to the absence of a genuine issue of

material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).  If the

movant carries this burden, "[t]he burden then shifts to the non-moving party to come forward

with facts sufficient to create a triable issue of fact." Id. at 718-19.  Moreover, "the non-moving

party must come forward with some evidence beyond the mere allegations contained in the

pleadings to show that there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d

872, 875 (4th Cir. 1992).  The non-moving party may not rely on beliefs, conjecture, speculation,

or conclusory allegations to defeat a motion for summary judgment. See Id.  When the non-

moving party fails to establish the existence of an element essential to that party's case, "there

can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an

essential element of the non-moving party's case necessarily renders all other facts immaterial."

Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548.

Officer Keatley's sworn testimony, if unrebutted, is sufficient to establish his right to

summary judgment on Smith's constitutional and state tort claims.  As a result, the burden shifts

to Smith to establish that material facts in dispute present a genuine issue for trial.  Baber, 977

---

[6] The Fourth Circuit has held that officers are justified, and therefore immune from § 1983 claims, when a pat-down search involved touching and patting detainees "on top of their clothing, in certain sensitive areas." See Taft v. Vines, 83 F.3d 681, 684 (4th Cir. 1996) (en banc) (panel opinion adopting dissent in Taft v. Vines, 70 F.3d 304, 328-19 (4th Cir. 1995), and affirming grant of qualified immunity to officers accused of touching detainee's "breasts and buttocks" and "between [her] legs in [her] private parts").

F.2d at 875. Conceding, for purposes of his motion, that a sexually invasive search of the type

Smith describes, would create a genuine issue for trial on all three claims, Officer Keatley argues

that no reasonable juror could conclude that he was the officer whose conduct Smith claims to

describe.

Smith initially brought these claims against an Unknown Officer, described in the

original 281-Complaint as the Second Officer, in order to distinguish him from Officer Ray. She

was unable to identify any officer as the Second Officer until late in the discovery phase of the

original litigation. Her first mention that she believed the Unknown Officer was Officer Keatley

occurred in a motion filed January 23, 2009 – approximately four months after filing suit and

more than two years after the September, 2006 incident. In the motion filed that day – shortly

before her extended time to serve the Unknown Officer expired – Smith stated:

> [S]he has been seeking to identify the Unknown City of Virginia
> Beach Police Officer and is still attempting to do so within the
> framework as provided by the Court . . . Smith names Officer Jay
> D. Keatley, Jr. which (sic) upon information and belief, is the
> Unknown City of Virginia Beach Police Officer.

ECF No. 69 at 13 – 14. On the same day during proceedings before the Court, Smith's counsel

also stated that Smith had identified Keatley, but refused to state how. (ECF No. 94, at 30).

During the 2009 hearing, counsel stated "The method by which we chose, or that Ms. Smith

chose Officer Keatley, I'm happy to disclose to the Court in camera, but it's really attorney/client

privilege." In fact, Smith herself has never stated, in sworn testimony or by affidavit, how she

came to believe Officer Keatley was the Unknown Officer. Eventually, at a hearing before the

undersigned on this motion, Smith's counsel stated that Smith had earlier chosen Officer Keatley

from a two-person photo array. According to this proffer by her counsel, Smith was shown only

two photographs – those of Officer Keatley and Officer Hewlett, both City of Virginia Beach

31

Police K-9 Officers, and she selected Officer Keatley's photo.  Her attorney stated:

| | |
|---|---|
| Mr. Hart: | I gave her the two pictures of the K-9 officers.  The first responders were K-9 officers.  I said was this one of these guys the guy who did this thing to you.  She told me yes.  She picked the right guy. |
| The Court: | Okay.  Well you need to - - you need to be able to articulate to me how it was that, one, that she determined it was one of the two K-9 officers. |
| Mr. Hart: | She did not do that selection, Judge.  I did. |

(ECF No. 208 at 19).

Absent counsel's unsworn assertion, there is no evidence in the summary judgment record to support an inference that the person who searched Smith must have been either Officer Keatley or Officer Hewlett.  In fact, several officers were present at the time she claims to have been searched.  The civilian, Bullard, upon whom Smith relies to corroborate her description that another officer searched her, actually described a somewhat chaotic scene.  In his recorded statement to investigators, Bullard first acknowledged that Ray searched Smith, but then stated "there was another officer, it got kind of crazy at that point . . . There was . . . about five or six cars came up, K-9 and everything . . . , so it got lit up pretty quick."  (ECF No. 158-2 at 9).

In all, thirteen Virginia Beach police officers responded to the altercation between Officer Ray and Smith.  Other than her selection of Officer Keatley from the artificially narrowed photo array, Smith has virtually no basis upon which to conclude the Unknown Officer was Officer Keatley.  Asked in interrogatories to provide a written description of the alleged Second Officer, Smith failed to answer.  In her deposition she described her alleged assailant as "athletic, a little taller than me, brown hair.  I-I don't know."  (Smith Dep., ECF No. 134-2 at 20).  When asked to select Officer Keatley from a photo array prepared by the Defendants and

containing pictures of all the officers involved in the incident (including the same picture of Officer Keatley which she allegedly identified to her counsel), Smith was unable to do so.  Her deposition testimony is as follows:

| | |
|---|---|
| Mr. Beverly: | With this pen could you identify Officer Keatley for me. |
| Mr. Hart: | [Objection]. |
| Smith: | Yeah, I don't know cause it looks like a couple of them.  But I could point out Officer Ray cause he doesn't look like anybody else. |
| Mr. Beverly: | Ok, could you on his photograph . . . could you identify, could you write in Ray? |
| Smith: | [Complies]. |
| Mr. Beverly: | And could you do the same for Officer Keatley? |
| Smith: | Not anymore, I don't think so. |
| Mr. Beverly: | You don't see Officer Keatley? |
| Smith: | I don't know.  Like I said he – I can't do it, I can't, I can't. |
| | . . . |
| Mr. Beverly: | Is your answer that you do not see Officer Keatley? |
| Smith: | No. |
| Mr. Beverly: | Ok. |
| Smith: | My answer is that there are a couple of them that . . . look like . . . what I can remember of Officer Keatley and Officer Ray is distinctive. |

(Smith Dep., ECF No. 134-2 at 22-24; ECF No. 133-20).

Officer Keatley's counsel then asked Smith to indicate on the photo array all those people she thought could be Officer Keatley.  Smith marked three individuals, none of whom was

Officer Keatley.  (Smith Dep., ECF No. 134-2 at 25-26; ECF No. 133-20).

Later, in response to questions from her own attorney, Smith answered as follows:

| Mr. Hart: | At the vehicle another officer searched you, you identified as Officer Keatley; is that correct? |
|---|---|
| Smith: | Uh-huh. |
| | . . . |
| Mr. Hart: | Do you have difficulty remembering the exact features of that officer? |
| Smith: | Yeah. |
| Mr. Hart. | Ok, do you have difficulty remembering certain facts about the event? |
| Smith: | No.  I – I know what happened. |

Smith's counsel then handed her the photo array again and asked her to mark all those individuals whom she was sure were not Officer Keatley.  Smith complied, marking Officer Ray and another four, a total of five officers out of the thirteen depicted, leaving eight officers as potential Officer Keatleys.[7]  The testimony concluded as follows:

| Mr. Hart: | So everybody that you haven't marked an X by could be Officer Keatley? |
|---|---|
| Smith: | Yeah. |
| Mr. Hart: | I'm asking you mam, I'm not telling you.  Is that your testimony that . . .? |
| Smith: | Yeah. |
| Mr. Hart: | If you didn't mark an X by him, it could be Officer Keatley? |
| Smith: | Yeah. |

---

[7] The only officers, other than Officer Ray, excluded by Smith were either African American or had gray hair.

(Smith Dep., ECF No. 134-2 at 61-62).

While Smith's attorney preserved objections to the use of the photo array, those objections have been addressed in the summary judgment record by authentication of the exhibits. (McLane Aff., ECF No. 133-21). The photos do not depict the officers exactly as they were dressed during the encounter, but they are all dressed alike. In addition, Smith had no difficulty correctly identifying Officer Ray from the same photo array. Like Officer Keatley, Officer Ray is white and younger. In addition, Officer Ray actually testified that he – not Keatley or any other officer – searched Smith prior to placing her in his police cruiser. In short, Smith has established no foundation based on visual identification, for her claim that Officer Keatley was the officer responsible for the sexually invasive search she described. At best, Smith can testify from personal knowledge that there is a one-eighth chance that Officer Keatley is the officer she accuses of violating her rights.

Federal Rule of Civil Procedure 56(e) requires that affidavits "be made on personal knowledge, set out facts admissible in evidence, and show that the affiant is competent to testify on the matters stated." In reviewing a motion for summary judgment the Court is limited to considering evidence which would be admissible at trial. Kennedy v. Joy Techs, Inc., 269 Fed. Appx. 302, 308 (4th Cir. 2008). Additionally, there is no genuine issue of fact if the only evidence offered by the plaintiff in opposition to summary judgment is an affidavit contradicting his or her own deposition testimony. Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).

This is not a case where Smith had positively identified Officer Keatley previously, but is unable to do so now due to the passage of time. It appears Officer Keatley was initially named primarily as a result of Smith's counsel's determination that the officer involved was one of the

K-9 officers and Smith's "choosing" him from the two photos of Officer Hewlett and Officer Keatley presented to her. However, there is no evidence in the summary judgment record to support counsel's artificial narrowing of the photo array. Moreover, the fact that an identical photo of Officer Keatley, presented among all of the photos of responding officers, was not even among the first three Smith selected as depicting her alleged assailant renders her prior, private identification from the same photo little more than speculation.

The only other facts Smith can rely upon to establish Officer Keatley was the officer involved in the alleged sexual assault, involve the witnesses who referred to a second officer present at the car where Smith claims she was searched a second time. The civilian, Tony Bullard, described seeing another officer search Smith. (ECF No. 158-2 at 9). In addition, testimony from Officer Ray could be construed to suggest he left Smith in the custody of another officer. (Ray Dep., ECF No. 134-1 at 61). However, neither of these witnesses identify the second officer as Officer Keatley, or as a K-9 officer. In addition, neither Bullard nor Officer Ray describe a "second search." Officer Ray unequivocally stated that he frisked Smith prior to placing her in the police car and that no other officer searched her. (Ray Dep., ECF No. 134-1 at 61). Bullard initially described Officer Ray searching Smith, but later, after describing the overwhelming response from other units, concluded that it was another officer. (ECF No. 158-2 at 9). Officer Hewlett, who was also deposed, could not recall who was present at the police cruiser where Officer Ray escorted Smith. He was certain, however, that it was not another K-9 officer and, therefore, not Officer Keatley. (Hewlett Aff., ECF No. 182-15 at 3). Finally, Lisa Rose, Bullard's girlfriend who was also on the scene, describes generally the presence of other officers. Her testimony, however, even in the light most favorable to Smith, cannot be construed to support a second search, much less a search by Officer Keatley. Rose's testimony, cited by

Smith, to support her claims included the following three lines:

> And then another officer came, canine unit, because he had a dog by his side and
> dogs barking. And eventually they got to where they could handcuff her.

Though not cited by Smith, Rose's testimony here continued: "And by then there were a

bunch of cop cars on the scene." (Rose Dep., ECF No. 182-13 at 17).

All of this testimony, even taken in the light most favorable to Smith, may be sufficient to

create a material issue concerning whether Smith was searched by an officer different from Ray.

However, neither Rose, Bullard nor Officer Ray identify Officer Keatley or any K-9 officer as

that second officer. Officer Keatley and Officer Hewlett both unequivocally testified that Officer

Keatley was not involved in any search. As a result, the only fact upon which the jury could rely

upon to conclude that Officer Keatley was the officer allegedly involved in the second search

(which only Smith has described) is his presence on the scene. It is undisputed, however, that

numerous officers were on the scene by this time. Moreover, Officer Keatley was deployed with

his K-9 partner during the altercation. Officer Ray, Officer Keatley and Bullard's girlfriend,

Lisa Rose, all testified that the dog was with him. Officer Keatley has testified that the dog

remained under his control throughout the encounter and thus, he would have had a single hand

occupied with the animal throughout his involvement with Smith. (Keatley Dep., ECF No. 182-

11 at 11-17). Smith denies ever seeing any animals and states that the officer who searched her

used both of his hands. (Smith Dep., ECF No. 134-2 at 28, 34).[8]

Thus, although Smith has stated that the officer who searched her was Officer Keatley,

she has provided no evidentiary foundation for this testimony. Even accepting all of the facts in

---

[8] Smith's description of the alleged second search has also varied. In her deposition she described that it occurred
outside the police cruiser, prior to her being placed in the rear seat. (Smith Dep., ECF No. 134-2 at 19). Her
designated expert (upon whom also relies to oppose summary judgment) said in his deposition that she described
being searched while she was in the car. (Archer Dep., ECF No. 161-9 at 9-10).

the light most favorable to Smith, there is simply no factual basis upon which the jury could conclude that the officer involved in the alleged sexually invasive search must have been one of the K-9 officers, or Officer Keatley himself. As a result, her attorney's proffer regarding Smith's previous selection of Officer Keatley's photo from the two-person array he prepared, combined with her inability to provide any meaningful description, or to identify him among the first three officers she selected from a complete photo array, is insufficient to create a dispute of material fact.

The Court is aware of authority permitting cases to proceed against multiple defendants even when the plaintiff is unable to specifically identify which defendant was responsible for the harm. See e.g. Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir. 1986), abrogated on other grounds by Graham v. Conner, 490 U.S. 386 (1986). However, those cases generally involved specific testimony that the accused officers were present at the exact time allegedly unlawful force took place. Simply being present at the scene is insufficient. There "must be some evidentiary basis from which a jury could infer the individual involvement of specific officers." Esteem v. City of Pasadena, No. cv04-662 – GHK, (unpublished), 2007 WL 4270360 (C.D. Cal. Sept. 11, 2007) at *14 (emphasis in original); see also, Pryor v. City of Chicago, No. 07c2479 (unpublished), 2010 WL 3724707 (N.D. Ill., September 15, 2010) (granting summary judgment to officers, despite earlier affidavit identifying them, when plaintiff could not describe or identify them from photo array, and basis of earlier affidavit was suspect); Thornton v. Spooner, 872 F.2d 1029 (table) text available at 1989 WL 34026 (6th Cir. March 21, 1989) at *2 (affirming summary judgment for one of two officers allegedly involved in forcing plaintiff into police car, in part based on plaintiff's inability to identify which officer pushed and attributing the use of force to the particular officer would be speculative).

38

Because Smith cannot identify any officer whom she alleges searched her a second time, the evidence in the summary judgment record that Officer Keatley performed such a search is insufficient to create a dispute of material fact necessary to survive summary judgment.

## V.    CONCLUSION

For the foregoing reasons Smith's motion for summary judgment is DENIED; Officer Keatley's motion for summary judgment is GRANTED and Officer Ray's motion for summary judgment is GRANTED in part and DENIED in part.  The case will proceed to trial on Smith's constitutional claims of excessive force and state law claims of assault and battery.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

February 28, 2012